**In the Interest of S.D. and K.D.**

No. 04–97–00412–CV.

Court of Appeals of Texas,
San Antonio.

Aug. 31, 1998.

Rehearing Overruled Sept. 24, 1998.

Tricia Hamil, Hamil & Hamil, P.L.L.C., Kerrville, for Appellant.

Scott F. Monroe, Kerrville, Cathy O. Morris, Regional Attorney, Boerne, Mark Coffee, Assistant Attorney General, Austin, for Appellee.

Before LÓPEZ, STONE and DUNCAN, JJ.

## OPINION

STONE, Justice.

This appeal of a decree terminating parental rights raises questions about what constitutes a county of proper venue when the parents and children are transient with no fixed place of residence. Because the record reveals that the parents agreed to venue in Kerr County, and because the transfer to Kerr County was based on reasonable factors, we affirm the transfer. We also find the evidence legally and factually sufficient to support the termination; therefore, we affirm the decree of termination.

### FACTUAL BACKGROUND

This appeal arises from a suit terminating the parental rights of Mary Josephine Ybarra and Rumaldo Dominguez to their daughters, S.D. and K.D. Ybarra and Dominguez have three daughters: R.D., S.D. and K.D. R.D. was born in May 1993. At her birth, R.D. tested positive for heroin. As a result, she was placed in a foster home. After working with R.D.'s parents for about two years to enable them to take care of the child, the Texas Department of Protective and Regulatory Services (the Department) asked the trial court to terminate the couple's parental rights. The couple's parental rights were terminated in October 1995 through a proceeding in Kerr County. That action was appealed, and affirmed in a decision by this court. *See In re R.D.*, 955 S.W.2d 364, 367 (Tex.App.—San Antonio 1997, no writ).

In the meantime, S.D. was born in February 1995, followed by the birth of K.D. in May 1996. At birth, K.D. tested positive for morphine. Very shortly afterwards, both S.D. and K.D. were placed in foster care, and the Department moved to terminate the couple's parental rights in regard to the two younger girls. The trial court terminated parental rights in January 1997. In this appeal, Ybarra and Dominguez raise four issues challenging the trial court's decree terminating their parental rights to S.D. and K.D.

### VENUE

■ The Department took custody of S.D. and K.D. in San Antonio under an emergency order from the 289th District Court in Bexar County. Shortly thereafter, the case was transferred to the 198th District Court in Kerr County, where parental rights were later terminated. In their first issue, Ybarra and Dominguez contend that Kerr County was an improper venue, and consequently the decree of termination must be reversed and the case remanded for a new trial in Bexar County. This claim is without merit because the record establishes that Ybarra and Dominguez agreed to the transfer to Kerr County.

■ The law in Texas has long been that any party to a lawsuit may expressly or impliedly waive rights conferred upon him by a venue statute. *Grozier v. L–B Sprinkler & Plumbing Repair*, 744 S.W.2d 306, 309 (Tex.App.—Fort Worth 1988, writ denied). The matter of venue is a personal privilege which may be waived. *See id.; Mooney Aircraft, Inc. v. .Adams*, 377 S.W.2d 123, 125 (Tex.Civ. App.—Dallas 1964, no writ). An express waiver is shown by clear overt acts evidencing an intent to waive, while an implied waiver occurs when a party, often inadvertently, takes some action inconsistent with his position on the venue issue and therefore is held to have waived his rights thereon. *Grozier*, 744 S.W.2d at 309.

The record supports a finding of express waiver. Nine days after the Department took custody of the children, the initial adversarial hearing took place in the 289th District Court of Bexar County. At the start of the

hearing all persons present identified themselves on the record. Those present included an assistant district attorney representing the Department, an attorney ad litem for the children, several caseworkers, and the parents. The parents were not represented by counsel. After those present identified themselves, the Department stated that it was seeking temporary custody of the children, and made an oral request to transfer the case to Kerr County. The children's ad litem indicated she had no objections, and the Department's attorney then conferred with the parents on the record regarding the proposed transfer. The record reveals the following exchange:

> MR. MCCLINCHIE (the Department's attorney): Judge, actually, I haven't gotten to confer. So let me inquire of the parents.
>
> Are y'all in agreement with the State taking temporary custody?
>
> MS. YBARRA: Yes.
>
> THE COURT: I need for you to speak up. I can't hear you.
>
> MS. YBARRA: Yes. But we're trying to see if they can be placed with a relative, my sister.
>
> MR. MCCLINCHIE: And are you willing to work with the case worker in Kerrville?
>
> MS. YBARRA: Yes.
>
> MR. MCCLINCHIE: Because it will go to Kerrville, and you can ask them to study your relatives.
>
> So you're asking that some relatives be studied?
>
> MS. YBARRA: Yes.
>
> \* \* \* \* \* \* \* \*
>
> MR. MCCLINCHIE: So, otherwise, you're in agreement to take temporary custody at this time and transfer it to Kerrville?
>
> MS. YBARRA: Yes.
>
> \* \* \* \* \* \* \* \*
>
> THE COURT: I want the father to answer. Father, do you agree?
>
> MR. DOMINGUEZ: Yes.

Following this exchange the court received testimony from the parents and from three Child Protective Services caseworkers. At the conclusion of the hearing, the court, "finding an agreement of the parties," awarded temporary managing conservatorship to the Department and transferred the case to Kerr County. Based on this record, we hold the trial court properly determined that Ybarra and Dominguez agreed to the transfer to Kerr County.

■ The venue transfer is appropriate even in the absence of an agreement by the parents. Under the Family Code, venue in an original suit affecting the parent-child relationship is proper in the county where the children reside unless: (1) another court has continuing jurisdiction; (2) venue is fixed because of a divorce; (3) the suit requests an adoption; or (4) an exception as specified in section 103.001(c) applies. *See* TEX. FAM. CODE ANN. § 103.001 (Vernon 1996). S.D. and K.D. were never subject to any suit affecting the parent-child relationship prior to this proceeding, so there is no court of continuing jurisdiction. The proceeding did not involve a divorce or an adoption, and none of the exceptions specified in Section 103.001(c) apply. As a result, venue in this case rests in the county where S.D. and K.D. resided. *Id.*

■ Normally, children reside where their parents reside. *Id. at* § 103.001(c). The Family Code, however, does not specify the requirements for establishing a parent's residency for this type of proceeding. Although the Family Code does not specify the requirements for residency, the Supreme Court of Texas has articulated the elements for residency in a breach of oral contract suit under the general civil venue statute. *See Snyder v. Pitts*, 150 Tex. 407, 241 S.W.2d 136, 140 (1951). Under that statute, the elements of residency are: (1) a fixed place of abode within the possession of the party; (2) occupied or intended to be occupied consistently over a substantial period of time; (3) which is permanent rather than temporary. *See id.* at 140. In meeting these requirements, Texas law is clear that an element of permanency is necessary before a party can be considered a resident of a par-

ticular county. *See Tieuel v. Southern Pacific Trans. Co.*, 654 S.W.2d 771, 774 (Tex. App.—Houston [14th Dist.] 1983, no writ). For example, in a motion to modify child custody, "permanency may be shown either by presence in the county for an extended period of time or by some agreement, explicit or implied, by the party with a right to control the child's residence, for the child to stay in the new county for an extended period of time." *See Martinez v. Flores*, 820 S.W.2d 937, 940 (Tex.App.—Corpus Christi 1991, no writ). Likewise in a suit for divorce, residency requires " 'actual, physical and continuous living in the county of suit by one of the parties for the time specified [by Section 3.21 of the Family Code], coupled with a good-faith intent to make that county home.' " *Cook v. Mayfield*, 886 S.W.2d 840, 842 (Tex.App.—Waco 1994, no writ) (quoting *Beavers v. Beavers*, 543 S.W.2d 720, 721 (Tex.Civ.App.—Waco 1976, no writ), *reh'g denied* 545 S.W.2d 29). In *Mills v. Bartlett*, 377 S.W.2d 636 (Tex.1964), the court stated the following regarding "residence":

> The term 'residence' is an elastic one and is extremely difficult to define. The meaning that must be given to it depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual. Volition, intention and action are all elements to be considered in determining where a person resides and such elements

are equally pertinent in denoting the permanent residence or domicile.

*Id.* at 637 (citations omitted).

■ Certainly, this family had not established a permanent residence in San Antonio so that venue was proper in Bexar County. Rather, the record establishes that the family led a nomadic life after leaving Kerrville where their parental rights to R.D. were terminated. After R.D. was removed from their home, the couple lived with various relatives who resided in different towns.[1] These living arrangements were required because of their addiction to drugs and their inability to maintain steady employment. As a result, the family was unable to obtain a home of their own after leaving Kerrville. However, Ybarra testified that she "had [her] own place" in Kerrville. Kerr County, then, was the last county where Ybarra and Dominguez had a "fixed place of abode" within their own possession. *See Snyder*, 241 S.W.2d at 140. Under the circumstances of this case, the Kerrville residence was a proper residence to rely upon in determining the appropriate venue. As a result, Kerr County, the county where Kerrville is located, was a proper venue.

## FACTUAL SUFFICIENCY

■ The parent-child relationship may be terminated involuntarily if the petitioner establishes one or more acts or omissions enumerated in Section 161.001(1) of the Family Code and proves that termination is in the

---

1. As to residence, the record establishes the following:

a. In July 1992, Ybarra was arrested in Kerrville for possession of heroin. She pled guilty and was placed on probation for ten years. As part of her probationary conditions, Ybarra was required to report to her probation officer monthly and to participate in a drug rehabilitation program.

b. R.D. was born in Kerrville in May 1993, testing positive for heroin. The family lived in Kerrville for about nine months in the family's own home. During that time, Dominguez worked as a construction worker.

c. Sometime in 1994, Ybarra attended a rehabilitation program in Uvalde. After her release, the family lived with relatives—first in Hondo and then in San Angelo where K.D. was born in May 1996.

d. In December 1994, Dominguez was placed on probation in Hondo for forgery by passing.

In January 1995, he went to San Antonio. In May 1995, Dominguez met with his probation officer in Hondo and told her that he was then living and working in San Angelo. His probation case was accordingly transferred to San Angelo to accommodate that employment.

e. In February 1996, Dominguez appeared in County Court in Hondo for driving with a suspended license and was placed on probation. By April of 1996, he was failing to report in San Angelo.

f. After K.D. was born in May 1996, the San Angelo office of Child Protective Services began the process of offering services to the family. Without warning, the family departed San Angelo and moved in with a relative in San Antonio. One week later, S.D. and K.D. were placed in the care of Child Protective Services. Ybarra admitted that she left San Angelo to avoid this action.

g. Dominguez was released from jail in Hondo the day prior to the venue hearing.

best interests of the child. *See* TEX. FAM. CODE ANN. § 161.001 (Vernon Supp.1998). In this case, the Department relied on the following acts in its petition to request the termination of parental rights: (1) that Ybarra and Dominguez "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children," *see id.* § 161.001(1)(D), and (2) that Ybarra and Dominguez "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children." *See id.* § 161.001(1)(E). The Department's petition further alleged that it was "in the best interest of the children" that the parental rights be terminated.

In their next three issues, Ybarra and Dominguez attack the factual sufficiency of the evidence supporting the trial court's findings. To prevail on these issues, Ybarra and Dominguez must show that the evidence is insufficient to permit a rational fact finder to hold "a firm belief or conviction" about the truth of the finding. *See In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *In re R.D.,* 955 S.W.2d at 367. The evidence supporting termination in this case, however, is so strong that Ybarra and Dominguez are unable to meet this burden. Because the evidence supporting the court's findings in regard to the grounds for termination are so inextricably interrelated, our discussion of the evidence supporting the findings is consolidated. *See In re B.R.,* 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (recognizing that the parents' conduct is inherent part of a child's conditions and surroundings).

As for the Department's first ground for termination, Ybarra and Dominguez complain that the only witness who testified at trial who had personally observed the physical conditions and surroundings in which the children lived was Ybarra. Rather than testify that the children had been endangered by their conditions and surroundings, Ybarra testified that S.D. always had food, diapers, a place to sleep, and adequate care. In contrast, the parents argue, the Department presented no evidence that the children's living environment was dirty, unsanitary, or unsafe. As a result, Ybarra and Dominguez argue in their second issue that no evidence proves that they knowingly placed, or knowingly allowed the children to remain in conditions or surroundings which endangered the physical and emotional well-being of the children.

As for the Department's second ground for termination, Ybarra and Dominguez complain that the only evidence supporting the termination of parental rights in regard to K.D. is her prenatal exposure to heroin. In light of the brief time in which K.D. was in her parents care—eighteen days—Ybarra and Dominguez argue that prenatal drug use alone is insufficient to find that they engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered the physical or emotional well-being of the child. They further argue that no evidence exists to support this finding in respect to S.D. According to Ybarra and Dominguez, no evidence was presented that S.D. was exposed to drugs prenatally or that she was endangered in any other way by her parents' conduct. Because of these contentions, they maintain in their third issue that no evidence supports the trial court's finding that they engaged in conduct or knowingly placed their children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. Although K.D.'s prenatal exposure to drugs alone may be insufficient to support the trial court's findings, other evidence supports the trial court's findings regarding the environment and conduct that endangered the physical and emotional well-being of S.D. and K.D.

Elizabeth McPherson, Ybarra's probation officer, testified that Ybarra was placed on probation for using heroin in September 1992. Conditions of her probation required Ybarra to submit to monthly urinalysis testing and to participate in a drug rehabilitation program. Although she initially completed a rehabilitation program, Ybarra failed to meet many of the conditions of her probation: she failed to report to her probation officer, refused to submit to urinalysis testing, and failed to perform required community service. While on probation, Ybarra was ar-

rested for shoplifting and relapsed to using heroin, necessitating a second rehabilitation program.

Dr. Robert Clayton, an expert in the field of prenatal substance abuse, testified about K.D.'s special health problems. In particular, Clayton described K.D.'s reliance on one side of her body, and how one side of her body turned red when it was exposed to heat or cold. Clayton testified that K.D. will experience additional symptoms associated with prenatal substance abuse as she develops, including language and. learning problems. Clayton also described similar problems in S.D. Although S.D. was not tested for drug addiction when she was born, Clayton described symptoms that he characterized as consistent with prenatal drug exposure. Specifically, he described how he could write his name in S.D.'s skin with his finger, which is an indication of heightened sensation receptors caused by S.D.'s prenatal drug exposure.

Dawn Hernandez, Dominguez's previous probation officer, testified about Dominguez's history of criminal activity. This history included offenses for forgery by passing, shoplifting, and driving with a suspended license. As a probationer, Dominguez failed to report, failed to perform court-ordered community service, and failed to make required payments. According to Hernandez, the download of Dominguez's electronic monitoring device indicated that Dominguez violated curfew restrictions. Dominguez also tested positive for alcohol use, despite a probationary condition prohibiting the consumption of alcohol, and Dominguez admitted to Hernandez that he relapsed to using heroin when the family was in San Angelo.

In addition to testimony about Dominguez's criminal history, Shelley Satterwhite, a case worker with the Department, testified about the inability of the children's parents to support the family. According to Satterwhite, who worked with the family since February 1994, Ybarra and Dominguez had been unable to maintain a home of their own, forcing the family to live with relatives. Satterwhite attributed this inability to provide a home to drug addiction and criminal activity. This conduct resulted in both mother and

father being jailed at various times and the parents' separation from their children.

Perhaps most troubling, Ybarra testified that both she and Dominguez had used heroin for quite some time and that they used drugs together. She further testified that when Dominguez was working they used his earnings for drugs, and that at other times, they used money that Ybarra stole from Wal–Mart. She also acknowledged that she could have been jailed if she had been caught stealing, which would have prevented her from taking care of her children. She also testified that although she understood that using drugs during pregnancy could harm an unborn child, she continued to use drugs.

This testimony supports a conclusion that Ybarra and Dominguez knowingly placed, or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, and that they engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered the physical or emotional well-being of the children. An environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, or because the parents are once again committed to a rehabilitation program, endangers both the physical and emotional well-being of a child. Conduct that results in such disability, and conduct that subjects a child to a life of uncertainty and instability, endangers the physical and emotional well-being of a child.

In addition to the findings under Section 161.001(1) of the Family Code, the trial court also determined that termination of the parent-child relationship was in the best interests of S.D. and K.D. *See* TEX. FAM.CODE ANN. § 161.001(2) (Vernon Supp.1998). In their fourth issue, Ybarra and Dominguez argue that no evidence exists to support this finding. To prevail on this issue, Ybarra and Dominguez must show that the evidence is insufficient to permit a rational fact finder to hold "a firm belief" that termination is in the best interests of the children. *See In re*

**764**

*G.M.,* 596 S.W.2d at 847; *In re R.D.,* 955 S.W.2d at 367.

Although not part of this termination proceeding, the proceeding in which Ybarra and Dominguez lost their parental rights in respect to daughter R.D. is pertinent to determining whether termination was in the best interests of K.D. and S.D. As a result of the prior proceeding, Ybarra and Dominguez were aware of the effects of prenatal drug use on an unborn child and its results on family life, yet the couple did little to correct the behavior that resulted in the termination of their parental rights in regard to R.D. Dr. Clayton testified in detail about the special needs of K.D. and S.D., and he and other witnesses testified about the parents' inability to meet these special needs and to provide their children a proper home environment. Although this is a tragic situation, the best interests of K.D. and S.D. require them to be placed in a stable environment where they can receive proper care for their special needs. Because we firmly believe that the findings of the trial court are true, *see In re G.M.,* 596 S.W.2d at 847 and *In re R.D.,* 955 S.W.2d at 367, we overrule the three factual insufficiency issues.

Having overruled each issue, we affirm the decree of termination.

Dissenting opinion by ALMA L. LOPEZ, Justice.

LOPEZ, Justice, dissenting.

Although I agree with the majority that there is sufficient evidence to support the termination of parental rights, I disagree that venue is proper in Kerr County and, therefore, I respectfully dissent.

The majority finds that the parents of the subject children waived venue in Bexar County. In a matter as important as whether parental rights are to be terminated, it is absolutely essential that parents be fully and completely informed of their legal rights. In this case, the parents of the children were not notified that the question of venue would be addressed at the hearing on the Department's emergency order until the attorney for the Department made an oral motion to change venue. Further, the parents were unrepresented and were given an explanation of what was about to transpire as to venue by the Department's attorney in a few sentences during the hearing. After the explanation of whether the parties would agree that the case be transferred to Kerr County, the trial judge stated that because the Kerr County District Court was the court of continuing jurisdiction, venue would be transferred there. The basis for the judge's statement as to continuing jurisdiction was that there had been a previous termination case as to the parents' oldest child in Kerr County. However, that case had been fully adjudicated and had no connection to the case before the court in Bexar County.

Because the parents did not receive prior notice of the Department's intention to request a change of venue, and because there was no court of continuing jurisdiction, the change of venue to Kerr County was improper. I would reverse and remand this case to the trial court for a proper determination of venue.